5:24-cv-188-BJB

## AFFIDAVIT IN SUPPORT OF FORFEITURE COMPLAINT

I, Daniel R. Jones, hereby state as follows:

1. I am a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration. I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C.§ 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in Title 21 U.S.C. I am and have been a Task Force Officer of the United States Department of Justice, Drug Enforcement Administration (DEA) at the Paducah Post of Duty since December 2018. I am employed by the Kentucky State Police and am currently assigned to the Drug Enforcement/Special Investigations West Branch (hereinafter DESI). I have been assigned to DESI since January 2016. I have been employed as a sworn Law Enforcement Officer since March 2005 having received my law enforcement certification from the Kentucky State Police Academy at that time.

2. Of my approximately 19.5 years as a sworn officer approximately 8 of those years have been as a narcotics detective. I have overseen or been involved with numerous drug investigations and have assisted or managed controlled purchases of narcotics. I have participated in many hours of surveillance consisting of both physical and electronic observation. I have experience working drug investigations including those involving the diversion of prescription drugs. I also have experience investigating the medical practitioners who are prescribing the controlled substances and the pharmacists that distribute the controlled substances.

3. I have attended numerous classes relative to drug identification, trends, investigations, asset removal, undercover operations, clandestine operations and

Attachment A-1

manufacturing, surveillance techniques, selective drug enforcement, drug intelligence techniques vehicle concealment and confidential information management. In connection with my official DEA duties, I investigate criminal violations of state and federal firearms and narcotics laws, including, but not limited to violations of 18 U.S.C. §§ 922, et seq. and 21 U.S.C. §§ 841, et seq. I have received specialized training in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code. I have also been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from drug trafficking. This affidavit is based upon my personal knowledge, as well as information reported to me by other senior special agents, federal and local law enforcement officers and others with knowledge of the facts surrounding this case. I have participated in numerous long-term federal and state investigations that led to the execution of multiple search warrants for said violations. The investigations routinely utilize numerous confidential informants, as well as undercover agent/officers, to conduct their investigation.

4.     During my career, I have conducted or participated in numerous controlled substance investigations, including conspiracies to distribute controlled substances (21 U.S.C. §846), and the manufacture and possession of controlled substances with the intent to distribute (21 U.S.C. §841). These investigations targeted large scale drug trafficking organizations engaged in the sale, manufacture, importation, and distribution of heroin, methamphetamine, cocaine, marijuana, and other controlled substances. During the course of my work, I have had the opportunity to converse with admitted and known drug traffickers as to their methods, and those of their associates, regarding the manufacture, importation,

transportation, distribution and sales of controlled substances, as well as their methods used to conceal, transport, and launder cash and/or other types of drug proceeds. I have become very knowledgeable in the methods used by drug traffickers to import, conceal, transport, distribute, manufacture, and sell controlled substances, as well as their methods used to conceal, transport, and launder cash and/or other types of drug proceeds. These methods have also included the use of electronic devices, cellular telephones, computer applications, chat and texting applications, social media, the world-wide web, and even the "dark web" a highly compartmentalized and often anonymous layer of the world-wide web. It is quite common for today's drug traffickers to utilize the internet, cellular phones and electronics, and social media to help facilitate their drug trafficking and money laundering activities, especially since today, a great deal of illegal narcotics and substances are purchased and paid for via the world-wide web utilizing smart phones and computers. A great deal of drug trafficking is trans-national today due to the use of the world-wide web, computers, and smart cellular phones.

     5.    I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation; from my discussions with witnesses involved in the investigation; and from my review of records relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient reasonable and probable grounds to believe that the money seized from Xiaowen PI constitutes proceeds traceable to drug trafficking, intended for drugs, used or intended to be used to facilitate drug trafficking and a conspiracy to commit drug trafficking in violation of 21 U.S.C. §§ 841 and 846.

## FACTS OF THE CASE

7. On March 12, 2024, Xiaowen PI was a passenger in a vehicle that was stopped by the Kentucky State Police (KSP) for a traffic violation on I-69 at approximately the 68 mile marker. Juandi Zhang, the operator of the vehicle, was accompanied by Lichun Lin in the front seat. PI was seated in the rear. During the course of the traffic stop, a total of $49,990.00 in U.S. Currency was discovered and represents the defendant property in this case. PI, the only English speaker in the vehicle, claimed the funds were hers.

8. Upon first contact with the operator of the vehicle, Juandi Zhang, Trooper T.J. Williams with the KSP noticed a strong odor of marijuana coming from the vehicle. A few moments later Trooper Gerick Sullivan arrived and deployed his K9 Amigo, which positively alerted on the vehicle. Amigo is trained in the detection of narcotics and is a certified and reliable drug detection K-9. Sullivan stated that he could smell the odor of marijuana coming from the vehicle as well. A search was conducted by Troopers Lewie Dodd and T.J. Williams. Located in PI's purse was a large bundle of U.S. Currency (held by rubber bands). In the backpack next to where she was sitting, there were four additional bundles of U.S. Currency, all of which were being held together with rubber bands. Based on my training and

experience, the denominations of the currency (majority 20s) and the way it was bundled are consistent with drug proceeds.

9. PI stated initially that she knew the two other male subjects in the vehicle as friends (Lin and Zhang). Later, she stated that she did not really know them and that she had met them online. She also stated that she had flown to California from Kentucky. She stated that she worked for a company called ICAN as a designer and she had been paid for her services in cash.

10. Trooper Williams asked why she had not flown back to Kentucky from California. PI advised that airline tickets to fly back were too expensive and that she had paid the driver $300/350 to drive her back. Based on my training and experience, it is a common practice of drug traffickers to transport funds via motor vehicle to avoid detection as opposed to flying where their bags are subject to search. Also notable is that none of the three individuals in the vehicle had any luggage whatsoever, which would also be consistent with the transportation currency and/or narcotics.

11. During the traffic stop with the KSP, PI gave several conflicting statements regarding the currency in her possession. She initially told Williams she only had $10,000. She repeatedly stated that the money was for a car. Later she stated the money was to pay for a house. She stated that the money came from her work as a designer, from the company she worked for. She stated that she designed a house for which the customer paid cash, her company took half and gave the other half to her.

12. PI gave conflicting statements about her income. She stated that she had made approximately $20,000 during the year she had been in the U.S., and also stated that she made $200,000. She identified Kevin Rui as her boss at the company ICAN and stated the

Attachment A-5

company had paid her income half in cash and half on a card of some sort. She also stated that she received a W2. She said her boss (Rui) gave her the money. Later that day, Trooper Williams spoke to a Kevin Rui using a phone number provided by PI. Rui told Williams that he had used PI for design services on a part time basis for approximately three months. Rui stated that he had paid PI in both cash and on a card, but it was maybe $10,000 in total, but probably less than that. Trooper Williams asked Rui if he knew why PI would be in possession of a large amount of money and be in a vehicle with two men driving from California to Kentucky, he stated that it was a lot of money and he had no idea why. Rui's statement conflicts with PI's claim that she received the $49,990.00 from her boss for design work and conflicts with her claimed income.

13. PI is a Chinese National and stated that she crossed the border in Mexico to come to the United States. From her statements, it appears that she claimed asylum at the border, which was later confirmed. She had a social security card issued February of 2024, which states that it is valid for work only with DHS authorization. PI had a California operators license, which was issued in June of 2023.

14. When asked about the strong marijuana smell and if anyone had been smoking or had marijuana, PI stated no. She later stated that the driver worked for a marijuana factory. The trunk contained what appeared to be "shake" (very small amounts of marijuana residue). In my training and experience, the strong odor of marijuana throughout the vehicle indicated that a large amount of marijuana was very recently transported in the vehicle. In my training and experience, California is a source state for marijuana trafficking throughout the United States, which is transported throughout the United States through various means, but commonly through vehicles.

15. Later, in a different location, an independent K-9 deployment was conducted on the seized currency. The seized currency was placed in a paper bag in a line up, along with two other identical bags. Trooper Gerick Sullivan, who was unaware of the location of the currency in the lineup, deployed Amigo, who positively alerted to the bag that contained the seized currency.

16. DEA started the administrative forfeiture proceeding, during which PI filed the only claim through an attorney. Later, the attorney supplied three documents in support of PI's claim. One document is titled "Design and Construction Employment Contract", which purports to be a contract between Xiaowen PI (with listed company "Ican Law Firm Design Department") and XZF Trading Inc. (with contact person listed as Xiaohui Sang). The contract is purportedly for design services—specifically "Bar interior design, renovation and construction." The document outlines the payment amount and terms for PI's design services, with a start date of March 1, 2024, and an end date of April 20, 2024. It states that the designer would be paid $50,000 upon signing the contract, and $30,000 upon competition of the construction site. However, the contract does not appear legitimate—there are no signatures on the agreement, no notary stamp, etc., that would indicate the authenticity of the contract. Furthermore, PI stated her company took half and her boss gave her half, so the purported terms of the agreement are inconsistent with both her statement and possession of $49,990.

17. Another document provided in support of PI's claim is titled "Prove". It looks to be a typewritten statement purportedly made by Xiaohui Sang, the listed representative of XZF Trading Inc. In the document, Sang states that he paid Xiaowen PI $50,000 in cash for her "design fees and worker's fees." He stated that the $50,000 in cash was "the company's

Attachment A-7

interior renovation, design and decoration funds." It is dated March 15, 2024, and purportedly signed by Sang. It is not sworn under penalty of perjury or notarized.

18. The final document provided in support of PI's claim is a business checking account statement in the name of XZF Trading, Inc., covering the time period of December 2023 through March 2024. On the statement, someone drew a line to a transaction on January 26, 2024, in the amount of $54,738.00, with text added at the bottom reading "cash being withdrawn". The statement shows the transaction as a "miscellaneous" withdrawal. At first glance, the statement would appear to be potential proof that cash was withdrawn from XZF's bank, for payment to PI (however unlikely that may be). But no corresponding Currency Transaction Report (CTR) was found for this transaction. If the cash had been withdrawn, the bank would have filed a CTR because the withdrawal was over $10,000. Moreover, on January 26, there was an "official checks charge" fee for $10, which shows that the $54,738.00 withdrawal was <u>not</u> a cash withdrawal, but a certified check. Furthermore, the defendant currency was banded by rubber bands (not bank bands). So, no proof has been submitted that the defendant currency ($49,990.00 in U.S. Currency) was withdrawn from XZF's bank or any other bank.

19. The XZF bank statement shows that the account had deposits and withdrawals, consisting mostly of large wire transfers (including international wires to Honk Kong) in addition to debit card, ATM and Zelle transactions. According to the statement provided, the XZF account was active for a short time period, from December 14, 2023 through January 30, 2024, at which point the account was negative $174.08. No other activity occurred on the account until March 11, when a deposit of $174.08 was made, resulting in a zero balance. In my training and experience, the account transaction history set forth in the statement would be

consistent with money laundering as accounts will often be used for short periods of time and either be abandoned (after all money is withdrawn and/or moved overseas) or most often closed by the bank for suspicious activity. Nothing else was provided in support of PI's claim.

## CONCLUSION

For the aforementioned reasons, there is probable cause to believe that the defendant property is subject to forfeiture to the United States, as proceeds directly and indirectly traceable to drug trafficking in violation of 21 U.S.C. §§ 841 and 846 (both facilitating and proceeds thereof), and proceeds intended to be furnished in exchange for controlled substances. Consequently, the property is subject to forfeiture under 21 U.S.C. § 881(a)(6).

Respectfully submitted,

DANIEL JONES (Affiliate)
Digitally signed by DANIEL JONES (Affiliate)
Date: 2024.12.13 09:02:35 -08'00'

Daniel R. Jones
Task Force Officer
Drug Enforcement Administration